UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
EVELYN MARK,

                          Plaintiff,

          -against-

THE BROOKDALE UNIVERSITY
HOSPITAL AND MEDICAL CENTER,
LEWIS MARSHALL, JR., CATHERINE
NORTON-LIND, and DANIELA NIEC,

                          Defendants.
-----------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JUN 3 0 2005 ★

BROOKLYN OFFICE

MEMORANDUM,
JUDGMENT & ORDER
04-CV-2497 (JBW)

APPEARANCES:

For the Plaintiff:

Stewart Law Firm
133-40 Hook Creek Blvd.
Rosedale, New York 11422
By:    Nadira Stewart
       Charmaine Stewart

For the Defendants:

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York 10017
By:    Lori Adelson
       Celena Mayo
       Jennifer Yasko

Jack B. Weinstein, Senior United States District Judge:

## Table of Contents

I.      Introduction..................................................................................................................3
II.     Facts............................................................................................................................5
        A. Background..........................................................................................................5
        B. Disparate Treatment Claims.................................................................................9



       1. Suspensions..................................................................................................9
          a. April 2002 Complaint and Suspension...............................................10
          b. July 2002 Complaint and Suspension.................................................10
          c. Additional Complaints.......................................................................11
              (i)    Dr. Asamoa's Complaint.....................................................11
              (ii)   Dr. Abboud's Complaint.....................................................12
              (iii)  Dr. Moradi's Complaint......................................................13
          d. Grieved Suspensions...........................................................................13
          e. Allegedly Unwarranted and Discriminatory Suspensions of
            Non-Parties.........................................................................................14
       2. Scheduling and Assignments.....................................................................14
    C. Hostile Work Environment Claim.....................................................................15
    D. Defamation and Breach of Fiduciary Confidentiality Claims............................19
    E. Retaliation Claims.............................................................................................22
    F. Pregnancy Discrimination Claims.....................................................................25
III.  Law...........................................................................................................................27
    A.  Summary Judgment...........................................................................................27
    B.  Statutes of Limitations......................................................................................28
       1. Title VII Claims........................................................................................28
          a. Discrete Discriminatory Acts.............................................................28
          b. Continuing Violation..........................................................................29
       2. Section 1981 Claims..................................................................................31
       3. State and Municipal Claims......................................................................31
       4. Defamation Claims...................................................................................31
       5. Breach of Fiduciary Confidentiality Claim...............................................31
    C. Merits...............................................................................................................32
       1. Title VII Claims........................................................................................32
          a. Disparate Treatment...........................................................................32
          b. Retaliation.........................................................................................35
          c. Hostile Work Environment.................................................................36
       2. Section 1981 Claims..................................................................................38
       3. State and Municipal Claims......................................................................39
       4. Defamation Claims...................................................................................39
       5. *Patterson v. City of Oneida*.....................................................................41
       6. Breach of Fiduciary Confidentiality Claim...............................................43
IV.  Application of Law to Facts.......................................................................................44
    A. Statutes of Limitations......................................................................................44
       1. Title VII Claims........................................................................................44
       2. Section 1981 Claims..................................................................................44
       3. State and Municipal Claims......................................................................45
       4. Defamation Claims...................................................................................45
       5. Breach of Fiduciary Confidentiality Claim...............................................45
    B. Merits...............................................................................................................45

1. Discrimination Claims...................................................................................45
     a. Disparate Treatment..........................................................................46
        (i) Scheduling and Assignment..................................................47
        (ii) Suspension...........................................................................47
     b. Retaliation.........................................................................................48
     c. Hostile Work Environment.................................................................48
2. Defamation Claims......................................................................................49
3. Breach of Fiduciary Confidentiality Claim......................................................49
V. Conclusion.........................................................................................................50

## I. Introduction

Plaintiff, a black female of West Indian descent, contends that while employed at

Brookdale Hospital, where she continues to be employed as a physician's assistant ("P.A."), she

has been discriminated and retaliated against based on:

> [her] race, ethnicity, national origin and/or ancestry, and gender
> discrimination due to pregnancy pursuant to Title VII of the Civil
> Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; 42
> U.S.C. § 1981 *et seq.*; the New York State Human Rights Laws,
> Exec. Law § 296; and the New York City Human Rights Law,
> N.Y.C. Admin. Code § 8-101 *et seq.*  Plaintiff further claims under
> the laws of the State of New York for defamation and breach of
> privacy.

Am. Compl. ¶ 2.

Her claim is that in addition to racial discrimination, "she was discriminated against, at

least in part, based on her pregnancy." Am. Compl. ¶ 40.  She alleges that:

> [a]s a result of such actions and the other actions that Plaintiff was
> forced to suffer, she endured stress-related complications in her
> pregnancy and was admitted to the Department as a patient due to
> complications that needed urgent medical attention.  During
> Plaintiff's stay in the Hospital's Department of Emergency
> Medicine, where Plaintiff also was employed, the confidentiality of
> Plaintiff's medical records was breached as her pregnancy became
> the source of gossip in the Department.
> . . . .

> Because the stress increased the complications of her pregnancy,
> Plaintiff was forced to take a leave of absence from work.

Am. Compl. ¶¶ 42, 43, 49.

Defendants move for summary judgment. They contend that plaintiff's racial and pregnancy discrimination claims fail because the evidentiary record establishes that: (1) plaintiff suffered no material adverse change in her employment; to the contrary, her salary, which was set by her union's collective bargaining contracts, increased every year; (2) white P.A.'s had the same scheduling complaints as did plaintiff; (3) plaintiff was granted every leave requested, including maternity leave; and (4) the statistical evidence reveals that plaintiff's supervisor, Catherine Lind, increased the percentage of black P.A.'s in the Emergency Department from 50% to 75% during the relevant period, contrary to plaintiff's claim that "minority representation in the Department [fell] without cause." Am. Compl. ¶ 17. Their position is that no hiring or employment decisions affecting plaintiff were grounded in whole or "in part on unlawful discrimination." Am. Compl. ¶ 20.

It is not unnatural for people in plaintiff's position to be, in the words of a young John Jay, particularly "sensible of indignities," in the course of their employment. WALTER STAHR, JOHN JAY: FOUNDING FATHER (2005). As indicated in a decision dismissing a related case:

> While plaintiff, a member of a much discriminated against class, is
> undoubtedly sensitive to slights that might reasonably be perceived
> by her as motivated by illegal animus, those named as defendants
> cannot legally be charged with causing her injury. The subjective
> and ambiguous nature of the claims and the difficulty in
> appreciating the subtle atmospherics of employment conditions
> require a full and sympathetic analysis of plaintiff's claims.

*Nicholls v. Brookdale*, 03-CV-6233. Viewing plaintiff's contentions with the utmost sympathy,

4

there is no merit to them.

## II. Facts

A. Background

Plaintiff was hired by Brookdale Hospital as an Emergency Department P.A. in February of 2001 and is currently employed there. Defs' Rule 56.1 Statement ¶ 1. The duties of such a P.A. include providing care to emergency department patients and ordering diagnostic testing under the clinical supervision of an attending physician. Defs' Rule 56.1 Statement ¶ 2. P.A.'s are known as "physician extenders" ("P.E.'s"). Another class of P.E.'s is made up of nurse practitioners ("N.P.'s"), who have in general somewhat higher academic qualifications than P.A.'s and can operate with more freedom from physician supervision. When plaintiff was hired the Emergency Department had no N.P.'s. Introduction of N.P.'s into emergency room service in and after 2000 is claimed to have somewhat diluted the percentage of black P.E.'s since blacks constituted a lesser percentage of N.P.'s than P.A.'s.

In May 2000, defendant Catherine Lind was hired as Director of Emergency Services by the defendant hospital, a position she held until her resignation in March of 2004. Defs' Rule 56.1 Statement ¶ 3. Ms. Lind, an N.P., acted as the administrative, or non-clinical, supervisor of the Emergency Department P.E.'s. Defs' Rule 56.1 Statement ¶ 4.

Plaintiff alleges that Ms. Lind exceeded the scope of her authority in supervising the P.A.'s. There is nothing in the record to support the conclusion, nor does it affect the merits of her claim.

Ms. Lind's conduct is central to plaintiff's claims. Plaintiff alleges that she discriminated against black P.A.'s on the basis of race, ethnicity, ancestry or national origin. The basis of that

5

claim rests largely on allegations that Ms. Lind's hiring and firing practices were discriminatory. *See, e.g.*, Am. Compl. ¶¶ 14-17 ("Prior to LIND's employment at the Hospital, the Physician['s] Assistants in the Department of Emergency Medicine predominantly were black people. Statistically, many of the black Physician's Assistants in the Department were of West Indian heritage, national origin, or ancestry. Since LIND's employment as the Director of Nursing/Director of Emergency Services, the Hospital has wrongfully terminated, demoted, and otherwise adversely disciplined approximately 20 Physician's Assistants of Plaintiff's race, national origin, ethnicity and/or ancestry."); Pl. Depo. at 81 ("When I did start working in the ER there were a lot of the employees who were Black of West Indian Heritage. As Catherine Lind started hiring people of different races the demographics of the ER changed dramatically. I saw over a period of time that it changed to reflect a larger percentage of Caucasian nurse practitioners as well as PAs and that is not the way it was when I came to the ER.").

At the time Ms. Lind became Director, defendants contend that over 50% of the fourteen Emergency Department P.A.'s were black. Defs' Rule 56.1 Statement ¶ 7. Contrary to plaintiff's conclusory allegations, while Ms. Lind was employed as the Director, from May 2000 to March 2004, defendants have proffered largely uncontradicted evidence that 75% of her hires were black. Defs' Rule 56.1 Statement ¶ 7. In her deposition, plaintiff conceded that "in 2005, I would say the majority of PAs are Black of West Indian heritage." Pl. Depo. at 83. She unsuccessfully attempted to provide an explanation for the apparent contradiction between that fact and her claims of discriminatory hiring by stating, "Well, I have to mention that a lot of White NPs were hired, but they didn't stay long." Pl. Depo. at 82. Plaintiff has introduced no evidence to support her discriminatory hiring claims, nor has her counsel proffered evidence that

6

would suggest that defendant's statistics fail to convey an accurate overall picture of Brookdale Hospital's hiring practices during the relevant time period.

Plaintiff seeks to incorporate the record in *Nicholls v. Brookdale*, 03-CV-6233, in support of her allegation that Ms. Lind's hiring practices were discriminatory. The more comprehensive analysis of the "facts" relating to hiring set forth by plaintiff in that case is deemed incorporated into the instant opinion. That analysis did not support a claim of discrimination.

The documents submitted by both plaintiff and defendants support the following narrative: While in her capacity as Director of Emergency Services, Ms. Lind implemented a system of "self-scheduling." P.A.'s were asked to submit their preferences, including dates and times that they wished to work on regular work days, as well as on possible vacation days and holidays. As reflected in numerous agendas for meetings between the P.A.'s, physicians, and Ms. Lind, it appears that there was some dissatisfaction among the P.A.'s with this system. At times, scheduling preferences would conflict. Ms. Lind retained ultimate authority over the assignments of work schedules, including time off. The record suggests that not everyone approved of the manner in which Lind exercised this authority, but there is no evidence that illegal discrimination was the basis for any scheduling:

> Q: [W]ere you aware of any tension in 2002 relating to scheduling of the P.A.'s?
> A: Yes.
> Q: What type of tension were you aware of?
> A: The schedule was initially made by a practitioner, whether it was a nurse practitioner or whether it was a P.A., and it's very hard to juggle – they had to have four people on nights or six people during the daytime, and when it came down to having an empty shift, they would sometimes just fill it, even though the full-time people had requested different days to work, so it was very frustrating when they got back the final schedule and they saw their

7

> name in spots that they had never intended to work.
> Q: Are you aware of any tension with the P.A.'s claiming they
> believed scheduling was done in a racial way?
> A. No.

Ann Landsman Depo. at 23-24. *See also* Pl. Depo. at 50 ("[W]e had a self-scheduling system

where we would schedule ourselves for the days that we wanted or that worked better for us. . . .

After we self-scheduled, this was presented to a facilitator who would be an extender. The

extender would then present that self-schedule to Cathy Lind who had the final say and who did

often switch the schedules around. So what you scheduled yourself . . . under self-scheduling

was not necessarily what you would get after it got to Cathy Lind.").

The most notable feature of Ms. Lind's tenure was that she began to increase the rate of

hire of N.P.'s. Nurse practitioners undergo training different from P.A.'s. They are permitted to

treat patients with less physician supervision. P.A.'s are not authorized to treat patients without

the supervision of a physician. Plaintiff contends that there was a larger ratio of white

individuals among the new N.P.'s than among the P.A.'s.

The hiring of N.P.'s was perceived with varying levels of approval by the P.A.'s. Cast in

the light most favorable to the plaintiff, there is evidence suggesting that at least some of the

P.A.'s were concerned with both the hiring of N.P.'s and the self-scheduling system; for black

P.A.'s, these concerns may have included a racial component, given that a white supervisor, who

was herself a nurse practitioner, in their view was hiring white N.P.'s who might rank above

them in the employment hierarchy at Brookdale, and who might be given preferential treatment

in scheduling and other matters. Plaintiff herself has acknowledged that a central concern

involved the potential for replacement of P.A.'s with N.P.'s:

8

Q. Was there some sort of tension between the nurse practitioners and the physician assistants at or about the time you began your employment?

A. Yes.

Q. Why?

A. Because the PAs felt threatened by the increased number of nurse practitioners that were being hired. We felt that our jobs were being threatened and that they would eventually take over our positions and we were being physically diminished while their numbers were increasing. We were being fired and suspended and there were no such actions taken against the newly hired nurse practitioners.

. . . .

Q. In terms of racial discrimination, how does that adversely affect the PAs, if at all?

A. It makes the PAs feel uncomfortable. I[t] makes us feel we were being replaced. We feel insecure about our job retention. We feel that they will take over our positions eventually. Moral[e] was quite low when we saw that more and more nurse practitioners, especially White ones were being hired and the PAs simultaneous[ly] were being fired.

Q. Are you saying that, and this is really for clarification, that the nurse practitioners['] mere existence threatens the PAs in the ED [emergency department]?

A. Yes.

Pl. Depo. at 148, 149, 173, 174.

B. Disparate Treatment Claims

Plaintiff premises her racial discrimination claims on the following adverse actions:

(1) a suspension in April of 2002;

(2) a suspension in July of 2002; and

(3) complaints regarding scheduling and assignments.

1. Suspensions

Plaintiff contends that Ms. Lind was responsible for what she claims were discriminatory suspensions. The record suggests, to the contrary, that plaintiff's suspensions were the direct

9

result of complaints by physicians regarding plaintiff's dereliction of duties, poor patient care, and unprofessional behavior.

### a. April 2002 Complaint and Suspension

On April 12, 2002, Dr. Greenberg wrote the following to Ms. Lind:

> I worked with PA Ms. Mark the night shift of 4/10/02 in Fast Track. She was frequently absent from her work area for a long times [sic] without any good explanation. She was seen by me sleeping in a GYN area while there were patients to be seen.

Apr. 12, 2002 Ltr. Subsequent to the submission of Dr. Greenberg's complaint, plaintiff received her first suspension:

> [W]hile working the night shift you were frequently absent from your assigned work area. Additionally, you were discovered to be sleeping in the Gyn area while patients were waiting to be seen.

Apr. 12, 2002 Susp. In her deposition, the plaintiff denied the allegations made by Dr. Greenberg in his complaint and suggested that they were fabricated. Pl. Depo. at 45 ("I had no problems with Dr. Greenberg until one incident where he made some false allegations about my absence from fast track on April 11th of 2002. Prior to that I had no problems with Dr. Greenberg so I was really surprised why those allegations came about in around April from him . . . . We had in fact a very good working relationship.").

### b. July 2002 Complaint and Suspension

On July 8, 2002, Dr. Niec submitted a formal complaint regarding the plaintiff to Dr. Valladeres:

> Please assist me in my request not to have P.A. Mark working with me during my shifts in ER [emergency room]. On almost every occasion when she worked with me she disappeared a

10

few times a night, sometimes for periods [of] more than two hours.
Also, her work is inadequate, superficial and at times dangerous.
She needs 1:1 supervision in order to assure proper quality and
proper patient care.

July 8, 2002 Ltr. Plaintiff subsequently was suspended for the second time with the following

notification:

A report has been made in which allegations of
unauthorized absence from patient care assignment were put forth.
This is the second offense.

July 17, 2002 Susp.

c. Additional Complaints

In addition to the complaints for which plaintiff was suspended, there appear to have been

at least three other complaints by treating physicians raising questions about her performance and

professionalism:

(i) Dr. Asamoa's Complaint

On November 27, 2001, Dr. Asamoa wrote the following to Dr. Valladeres, and provided

a courtesy copy to Ms. Lind:

[Evelyn Mark] has worked under my supervision on one or
two previous occasions shortly after her employment. She has
since been scheduled to work with me on a few other occasions.
Each time she has changed shifts with her colleagues. A review of
the records in your possession will reveal this fact.
On the 23rd and 24th of November she was scheduled to
work shifts under my supervision. She was present in the ER on
the 23rd but changed teams with [another PA]. She endeavored to
change the 24th shift with two nurse practitioners but was
unsuccessful. At that point she did inform one of them that if she
was unable to effect a change she would call in sick the following
morning – which she did.
I do not know what her personal reasons are for acting in
such a manner. However this demonstrates very unprofessional

11

behavior and caused a great deal of inconvenience to colleagues on the said date. I would like this situation to be addressed as expeditiously as possible to prevent further inconvenience to myself and other staff members. Thank you.

Nov. 27, 2001 Ltr.

In her deposition testimony, plaintiff addressed Dr. Asamoa's complaint:

> Q. Can you tell me what race [Dr. Asamoa] is? Black, White, Hispanic?
> A. She is Black.
> Q. And she is a woman?
> A. Yes, she is.
> . . . .
> Q. Explain the circumstances surrounding the difficulty that you testified having with Dr. Asamoa?
> A. Dr. Asamoa – and I'd like to add that I was not the only one having difficulty with her. She usually makes it very difficult for people who are new, she is a perfectionist. . . . The difficulty that I had with her was only for a very short period of sometime and I did try to get it resolved with Dr. Valladeres. The difficulty was this, Dr. Asamoa had a very abrasive manner. I was very new when I started working there. . . . I was very new and just coming out of school and her manner was very abrasive towards me in terms of during sign outs, for example, when I was giving sign outs to the other team and *she did not feel that I presented the case the way she probably would have liked me to.* Her manner in front of the other attendings and the other team was very abrasive and I had an observation to that; she repeatedly did that. . . . And that is the objection I had with her. In terms of working with her in other aspects there were no problem[s]. My objection was the way in which she spoke to me in front of other people . . . .

Pl. Depo. at 46-47 (emphasis added).

### (ii) Dr. Abboud's Complaint

On April 30, 2002, Dr. Abboud wrote the following, directing it "[t]o whom it may concern:"

> On April 11th, PA Mark requested a [GYN] consult from

> my resident Dr. Moradi for patient [X]. . . . After Dr. Moradi saw
> the patient, and spoke with me, I decided to also see the patient
> before our final assessment. At around 4:30am on April 11th, I
> answered a page from Miss Mark. Miss Mark wanted to know
> when my resident Moradi and myself would see her patient who
> was located in the [GYN] area in Major Medicine. I informed
> Miss Mark that we were in the operating room and would be there
> as soon as possible. At around 5:30am, the patient was taken for a
> sonogram.
>
> At around 6am, I answered a page from Miss Mark
> inquiring about our decision. I informed Miss Mark that Dr.
> Moradi and myself [were] on our way to the ER with the
> completed consult. At around 6:10am, Moradi and myself walked
> into the main ER. Miss Mark was waiting at the GYN desk. Miss
> Mark and myself both walked over to the patient's stretcher in
> position #11, in front of the asthma room, where we both explained
> to [Patient X] that she was going to be discharged with the
> diagnosis of Mittel-Schmertz.

Apr. 30, 2002 Ltr.

### (iii) Dr. Moradi's Complaint

Dr. Moradi, who co-signed Dr. Abboud's complaint, wrote a separate letter regarding the

same incident, from his perspective:

> On April 11th, PA Mark requested a consult from me for
> patient [X] who was in Fast Track. I accepted the consult.
> However, since I had other consults in the GYN area of Major
> Medicine, I requested that the patient be brought over to that
> location as a matter of convenience. Miss Mark agreed.

Apr. 30, 2002 Ltr.

### d. Grieved Suspensions

Plaintiff is a member of a union. Pursuant to her union's collective bargaining

agreement, plaintiff was entitled to pursue a three-step grievance regarding any employment

action she considered improper. Once denied at the third step, the union could then elect to

13

arbitrate the claim.

Plaintiff grieved both her April 2002 and July 2002 suspensions. Both were denied at each step of the three-step grievance procedure. The union declined to arbitrate her April 2002 suspension. Plaintiff did not request that the union arbitrate her July 2002 suspension.

### e. Allegedly Unwarranted and Discriminatory Suspensions of Non-Parties

The plaintiff provided deposition testimony to the effect that Ms. Lind harassed her by "coming around the areas that [she] worked constantly trying to look at [her] charts," claiming "heightened scrutiny of [her] work," and claiming that the level of scrutiny was more severe than "with any of the other people that I worked with." Pl. Depo. at 39. In support of her allegations that Ms. Lind subjected her to discriminatory heightened scrutiny, she alleged that:

> I also saw her constantly during the day shift constantly harassing other employees – not necessarily PA's, but necessarily all of Black West Indian heritage [sic] unwarranted suspension and these included the nurses, PCTs and this was going on during the day and some of the people that she did harass during the day ended up in suspension and [sic] so unwarranted, included, Delta Williams, Jennifer Johnson – there was another nurse, but I can't think of her name. But there were a lot of incidents during the day where Cathy Lind was harassing the employees.

Id.

### 2. Scheduling and Assignments

Plaintiff alleges that she and other black West Indian P.A.'s were frequently and disproportionately assigned to Team B - GYN. Pl. Opp. Summ. Judg. at 16. She claims that other non-white P.A.'s were disproportionately assigned to fast track/asthma. Id. According to plaintiff, "it is undisputed" that Team B - GYN is an undesirable clinical assignment. Id. She also claims that her scheduling requests frequently were disregarded whereas other non-black

14

P.A.'s "*appeared* to work a fixed shift." *Id.* (emphasis added). In addition, plaintiff contends that while she was pregnant,

> although Defendants were aware that Plaintiff had a problematic
> pregnancy and had been placed on bedrest, Defendant [Marshall]
> repeatedly made it difficult for Plaintiff to secure leave and
> threatened to discipline Plaintiff if she did not appear for duty.
> Plaintiff sought the intervention of her union delegate BARRY
> SLATER at these time periods. When Plaintiff was scheduled to
> return to work, the Hospital indicated that they were returning her
> to the day shift. Plaintiff complained and the Hospital then limited
> the day shift assignment to a certain period of time just to conduct
> reorientation training. The actions all constituted "materially
> adverse actions."

*Id.* Plaintiff's claim is that "non-black physician extenders were scheduled to work on specific days, at specific hours," that these shifts "did not comport with the official start and end times for work shifts," and that non-black physician extenders "were not assigned to disfavored clinical rotations." Pl. Opp. Summ. Judg. at 20. The plaintiff has failed to provide a single citation to the record; nor does the record contain evidence to support any of these allegations.

Plaintiff relies on the record in *Nicholls v. Brookdale*, 03-CV-6233, in support of the proposition that white P.A.'s were given preferential work shifts and clinical rotations and that black persons were terminated. The analysis of the facts in that case is incorporated into the instant opinion. In sum, in both *Nicholls* and the instant case, there is no evidence which would suggest that particular schedules were "materially adverse" to plaintiff, or that scheduling was ever determined based on race.

C. Hostile Work Environment Claim

In her deposition, plaintiff testified regarding her hostile work environment claim as follows:

15

A. I felt I was being treated differently because of the fact that I was Black that [Dr. Niec] refused to work with me because I was Black. I felt that I was being discriminated against. I felt that she was creating a very hostile and adverse working environment for me; I felt violated.

. . . .

A. There were complaints regarding the conflicts I had with Dr. Niec, which created a hostile work environment for me . . . .

. . . .

A. I would say that [Dr. Niec] creating this hostile work environment for [m]e began after my first suspension in April. The first incident I remember was on May 17th of 2002. I was working in fast trac[k] . . . . Dr. Niec was working in major medicine. And when Dr. Niec learned that this patient was coming from fast trac[k] and realized that I was working in fast trac[k] made a comment, I bet it's that Mark that sent that patient over here; I can't stand that Mark. Alesha Nicholls was in the area at the time that the statement was made.

. . . .

A. The second incident that I remember occurred – there were two incidents that occurred in October.

Q. Of '02?

A. Yes, '02. I was in major medicine and I was sitting on a chair and she came to me and said you know I need to sit on that chair. That is the chair that I was sitting in. That's the chair – this is my area. And as I was sitting she practically pulled the chair away. I did make a complaint about that in writing to Dr. Valladeres. And later on in October of that same year, a similar incident occurred where she practically forced me out of [a] chair that she felt that she should be sitting on. The other instances – there were several other instances. That one I described was in October of 2002. I reported it to Dr. Valladeres and requested not to be assigned to work with her any longer. Then she made the comment about she didn't want to work with that blimp when I was seven months pregnant in February of 2003. When I came back from my maternity leave around September of 2004 is when she made the comment of not wanting to work with that Black bitch.

. . . .

A. [D]uring the time of my pregnancy they continual[ly] assigned me to work with Dr. Niec who always created a very hostile work environment for me that affect[ed] my stress level, which adversely affected my pregnancy and caused me to go into preterm labor.

. . . .

16

A. I also feel that in continually allowing me to be scheduled
[with] Dr. Niec – all be it the fact that I had continuously requested
not to be scheduled. I think that it was contributing to
discrimination based on my pregnancy because it again created a
hostile work environment for me, which I told them that it affected
my health –
. . . .
A. I feel a lot of emotional distress that I suffered as a result of all
of these hostile work environments.
. . . .
Q. Have you testified to all of the incidents that you believe
created a hostile work environment for you?
A. At this point, I hope I did, but I will not say I testified to all of
them.
. . . .
A. I remember Dr. Niec calling me a slut openly in front of
everyone. I know there's more.
. . . .
Q. Are you claiming any other comments by Dr. Niec that were
discriminatory with respect to race? Did she make any other
statements that you consider to be discriminatory?
A. At this point I could remember two incidents where I was
called a blimp.
Q. Statements. Do you recall any other statements that Dr. Niec
made that you consider to be discriminatory based on race?
A. I cannot remember at this time.
Q. As we sit here today, the only comment that you recall having a
racial connotation was in February 2004 that was discriminatory?
A. I can remember that comment now.
Q. Are you claiming that because Dr. Niec didn't want to work
with you because of her claims that you are incompetent were
discriminatory based on race?
A. I'm claiming that the comment she made that I was
incompetent is untrue.
Q. You're not claiming that they are discriminatory based on race?
A. Yes, I am claiming that.

Pl. Depo. at 117, 120, 155, 156, 157, 158, 159, 179, 182, 218, 292, 293, 294, 303.

Plaintiff, in support of her claims of discrimination, hostile work environment, and

retaliation, has alleged that on two occasions, a supervising physician made inappropriate

17

comments, and that one comment included a racial component. According to the plaintiff, Dr.

Daniela Niec "referred to Plaintiff as a 'f-ing blimp' in February 2003 and refused to work with

her." Am. Compl. ¶ 41.

Plaintiff Nicholls alleges that Dr. Niec referred to her as a "black bitch." When Plaintiff

Mark was asked about it in her deposition in the instant matter, she responded as follows:

> Q. Are you making an allegation that Dr. Niec called you . . . a big
> Black bitch?
> A. No, I didn't say big Black bitch. The statement [I] remember
> that she made was, I don't know why they keep putting me to work
> with that Black bitch. The word "big," I don't recall her using that
> word.
> Q. And to whom did she say that?
> A. Ann Landsman.
> Q. And who is Ann Landsman?
> A. She is a physician assistant in the ER.
> Q. And what is her race?
> A. Caucasian, Jewish. I'm not sure how to express that.
> . . . .
> Q. When did she say that to Ann Landsman?
> A. On or about September of 2004 or 2003; I don't remember. I
> think it was 2003.
> Q. How do you know she said it [to] Ann Landsman?
> A. She said it to Ann Landsman in front of – she was standing
> right in front of [the] bathroom door in the GYN spot and I was in
> the bathroom and I overheard the entire conversation.

Pl. Depo. at 115-16. Ann Landsman confirmed the substance of the alleged incident with one

significant difference:

> Q. Do you recall that Dr. Niec in fact said I don't know why they
> assigned me to that black bitch to work with me?
> A. No, she never used black.
> Q. Did Dr. Marshall ask you whether Dr. Niec had called Ms.
> Mark a black bitch?
> A. Yes.
> Q. He asked you?
> A. Yes.

> Q. What did you tell Dr. Marshall?
> A. I said that no. It was not prompted – the comments had no racial connotation whatsoever. They were nasty, but they had no racial connotation.

Ann Landsman Depo. at 37-38.

Plaintiff also proffered evidence that Dr. Niec referred to her as an "f-ing blimp" in support of her pregnancy discrimination and hostile work environment claims:

> Q. Are you claiming that Dr. Niec calling you a blimp during your pregnancy is discriminatory?
> A. Yes.
> Q. On what basis?
> A. Because my belly was sticking out at seven months.
> Q. So you're assuming that she knew you were pregnant?
> A. At seven months, yes.

Pl. Depo. at 299.

For purposes of summary judgment, viewing the record in the light most favorable to the non-moving party, the court will assume that "black" was used in reference to the "bitch" comment plaintiff overheard. Plaintiff also alleges that Dr. Niec called her a "blimp." It is not clear on the face of the record that Dr. Niec was referring to plaintiff's pregnancy rather than her pre-pregnancy obesity, but for purposes of summary judgment, the former will be assumed.

D. Defamation and Breach of Fiduciary Confidentiality Claims

Plaintiff contends that her patient confidentiality, while she was admitted to the hospital for treatment, was breached, and that as a result "Plaintiff's relationship with her boyfriend, a doctor in the Department, deteriorated and the paternity of Plaintiff's child to be [sic] called into question." Am. Compl. ¶ 46. In support of that contention, she testified as follows:

> Q. What is the basis of your claim that Rosamond Payne breached your patient confidentiality?

19

A. Because a family friend overheard a conversation between Rosamond Payne and Barry Slater in the waiting area wherein Rosamond Payne approached Barry Slater and asked him why didn't he inform her that I was pregnant. Barry Slater replied that he did no[t] know that I was pregnant. She then asked him if he was the father of my baby and accused him of being the father of my baby.

Q. Did you ever have sexual relations with Barry Slater?

A. No.

   Ms. Stewart: Objection.

   Ms. Adelson: Well, she is accusing him of the paternity [sic] of the father.

   Ms. Stewart: That doesn't mean you can ask that.

   Ms. Adelson: If she doesn't name anybody else then there is nobody else to ask about, but this is the subject matter of this claim.

Q. Who was this person[al] family friend that overheard the conversation?

A. We know her as Mimi. She doesn't live in the country. She is currently living in Grenada and I have lost contact with her.

Q. Do you know her full name?

A. No, I just know her by that name. She's an old family friend.

Q. Is there any way you can find out her name?

A. I don't know.

. . . .

Q. What is the basis of your claims as to how she breached your patient confidentiality?

A. Because when she asked Barry Slater why didn't you tell me that Evelyn Mark was pregnant, he said I did not know that she was pregnant. And then he asked her how she came by that information and she said well, she's a patient here; that's how I know because she is a patient here and she is fifteen weeks pregnant.

Q. Weren't you a patient there?

A. Yes, on that day that she had that conversation. And I was indeed fifteen weeks pregnant. It [was] written on the chart. My pregnancy status was written on the chart.

Q. So are you claiming that Rosamond Payne looked at your chart and then went and told Barry Slater?

A. That's what I'm saying, yes.

Q. Did you see Rosamond Payne look at your chart?

A. No, I did not see her look at the chart?

Q. Do you know anyone else who did?

A. No.

Q. So what is the basis of your claim that she had looked at your chart?

. . . .

A. Because when asked how she came by that information, she said because she is a patient here.

Q. But wasn't it common knowledge that you were a patient there?

A. It wasn't common knowledge that I was fifteen weeks pregnant.

Q. That's not the question. Was it common knowledge that you were a patient there?

A. Yes.

. . . .

Q. When did Mimi tell you about this?

A. Well, actually it wasn't Mimi, but she told a family – you know, someone else who called me and told me that they didn't know that I was pregnant, that they got this information from Mimi.

Q. So Mimi didn't tell you directly, Mimi told another family member?

A. Well, I wouldn't say family member. I would say family friend.

Q. What is that person's name?

A. That person is actually not even in –

Q. What is that person's name?

A. She is like a cousin of a distant cousin. I mean, I don't even –
    MS. STEWART [counsel for plaintiff]: Say the name.
What is the problem, say the name.

A. I believe her name is Jacintha.

Q. Can you spell that?

A. J-A-C-I-N-T-H-A.

Q. And does she have a last name?

A. I don't remember what her last name is.

. . . .

Q. We had testimony last week so I don't want to repeat anything that we've already gone through. I want to clarify how you first came to hear that Rosamond Payne allegedly told Barry Slater he was the father of your child. My understanding is that a friend named Mimi told a friend who then told you; is that correct?

A. Actually there were two people involved. Mimi and Coco.

Q. Mimi told Coco?

A. Mimi originally heard the statement. Coco, I'm not sure if she

was actually there or not. I later confirmed that it was Mimi that told Coco.

. . . .

A. I have to preface this and say, there's an alternating naming system that we have.

. . . .

Q. Prior to November 23, 2002, were you and Rosamond Payne friends?

A. Yes.

Q. At the time you were admitted to the ER on November 23, 2002, were you still friends with Rosamond Payne?

A. No.

Q. Why weren't you friends at that time?

A. I stopped being friends with her when I found out that she was making advances towards my boyfriend that she was calling his house and asking him out to dinner. He complained to me that she would sit on his lap at work and he was very uncomfortable with that. That she would have inappropriate conversations with sexual innuendos and I was extremely upset. I felt betrayed and I did confront her and told her that it was inappropriate and disrespectful of our friendship and that I was going to terminate the friendship.

Pl. Depo. at 192-95, 202-203, 242, 205.

Plaintiff also alleges that this incident resulted in a defamatory statement:

Q. What are you claiming is the defamatory statement as it relates to this lawsuit?

A. I'm claiming that the defamatory statement that was made against me questioned the paternity of the father of my child and in particular that Barry Slater was the father of my child.

Q. What specifically were the statements that were made that you claim [are] defamatory?

A. That Barry Slater was the father of my child.

Q. Who made that statement?

A. Rosamond Payne.

Pl. Depo. at 241-42.

E. Retaliation Claims

Plaintiff claims that her suspensions were the result of her raising claims of

discrimination:

> Contrary to defendants' current assertions, Plaintiff's complaints were frequent and voluminous. During the first year of her employment with the Hospital, Plaintiff mostly made oral complaints. After noticing that her complaints were disregarded, Plaintiff commenced submitting written complaints both to management in the Department as well as upper management and to administrative agencies. . . .
>
> In addition Defendants cannot deny their knowledge of Plaintiff's protected activities. The record indicates that Defendants were well-aware of Plaintiff's complaints and that they even had characterized Plaintiff as "litigious" although Plaintiff has filed only one lawsuit – the action herein – against Defendants. On many occasions, Defendants even submitted replies to Plaintiff's complaints. Defendants additionally received copies of external complaints made by Plaintiff. The record additionally is replete with adverse employment actions that Plaintiff suffered within weeks, if not days, of her complaints. On one occasion, MARSHALL even threatened Plaintiff that he "could write letters too." The retaliatory actions continue to occur even today. On the morning of her deposition, NIEC felt compelled to complain to CHERSON that Plaintiff allegedly had abandoned her post the prior weekend. However, on the date in question, NIEC was not Plaintiff's supervisor and Plaintiff's supervisor had not made any such complaint. In addition, similarly situated employees who complained of or opposed, discrimination, such as the Nicholls plaintiff, were suspended and terminated.

Pl. Opp. Summ. Judg. at 27-28.

Despite plaintiff's assertion that "[b]ased on the evidentiary record, a jury may find that Defendants unlawfully retaliated against Plaintiff," *id.* at 28, the claim contains no citation to the record. The court has independently reviewed the entire record and identified evidence that plaintiff raised claims of discrimination:

> Q. Are you claiming that you were retaliated against because of your race?
> A. Yes.
> Q. What is the basis of your belief that you were retaliated against

23

because of your race?

A. I made both verbal and written complaints of being discriminated against and I made these complaints to various people including Jess Bunshaft, the director of human resources. Butchalotto (phonetic), Lewis Marshall.

Q. And what was the nature of [these] complaints?

A. I complained that I was being treated differently than people who were not from my same race with regards to scheduling matters. I felt that I was being discriminated against based on – *oh, are you asking about race right now*?

Q. Retaliation *based on race*.

A. There was one particular instance I wrote a letter to Dr. Marshall on November 19th about being discriminated against based on my race, because of my race in regards to scheduling matters. Even before that I had made lots of verbal complaints to [the] director of human resources, Jess Bunshaft – I have to backtrack a little bit.

Q. That's okay.

A. The first time I made those complaints were to – one of those people was Jess Bunshaft and I believe I spoke with him on several occasions. We had verbal interaction and exchange above this via telephone. I would say around March of 2002, we had several telephone conversations where I expressed to him that I was being treated unfairly, that I was being treated differently with regard the scheduling than other people *who were not of my race*.

Q. Did you memorialize this? Did you write a memo to him explaining –

A. I had verbal interactions with Mr. Bunshaft around this. Around March, I would say March, around that time, I had lots of verbal interaction with Bunshaft with regards to this matter. The question was, how was I retaliated against?

Pl. Depo. at 60-62 (emphasis added). The court will accept for purposes of the motion for summary judgment that plaintiff raised qualifying discrimination claims and that defendants were aware of those claims.

There is no evidence in the record to support an inference that subsequent treatment of the plaintiff was retaliatory:

Q. What is the basis of your claim that you were suspended

24

because of your race?

A. Because I believe those two actions were actions of retaliation provoked by my continuous verbal and written complaints . . . which began on or about March of 2002, and up to even April.

Q. And these written complaints were about your schedule?

A. Those written complaints were about not only my schedule, but complaints about my being treated differently than the White PAs or extenders because my schedule was being changed in a way that adversely affected my pay and adversely affected my scheduling. I also complained that I was being discriminated against because of my race because there was no other White PAs even NPs or nurses being disciplined like I was being, along with my other colleagues.

. . . .

Q. Can you name all of [the] White PAs that were in the emergency department in April of 2002 and July of 2002?

A. Ann Proveskya, Peter Perduk – do you want NPs also?

Q. No, I want physician assistants.

A. Rachel Pesce.

Q. And you're sure that's [it]? That's all there were in the whole department?

A. In 2002?

Q. Yes.

Pl. Depo at 117-119.

F. Pregnancy Discrimination Claims

The plaintiff's claims regarding pregnancy discrimination are unsupported by the record:

Q. What is the basis of your claim that the hospital discriminated against you because you were pregnant?

A. Because during the time of my pregnancy they continual[ly] assigned me to work with Dr. Niec who always created a very hostile work environment for me that affect[ed] my stress level, which adversely affected my pregnancy and caused me to go into preterm labor. I eventually had to leave very early, which I didn't plan to. Secondly, Dr. Marshall – I took a leave in December. I believe it was from December – this might not be accurate, but sometime in early December, maybe for a week because of problems I was experiencing in my high-risk pregnancy.

Q. Were you granted that leave?

A. I was granted that leave. At the end of the leave which I believe ended maybe early December, I was scheduled to return to

25

work and I was still having a lot of complications with the pregnancy and my doctor still advised me to remain on bedrest. I was scheduled to return to work from that lea[ve], I believe December 9th, I'm not quite sure. And my doctor extended my leave based on the fact that I [was] still in preterm labor and he felt that [I] needed to be on bedrest. I had the doctor fax those documents over to Dr. Marshall's office. I was supposed to work that night and I called him just to make sure that he did receive it and that he had the understanding that I had a medical condition and I couldn't return to work because of the complications of my pregnancy. And he said that he didn't receive the fax and based on that fact, what I was stating to him meant nothing and I was expected to report to work that night regardless of the fact that I was still having difficulties and I felt that I was not fit to return to work. I felt that he did not make the proper accommodations. I then had to leave and go to my doctor's office and facilitate that fax be sent over.

Q. The fax that you sent, was that a note from you or your doctor?

A. My doctor had sent a note, but he claimed that [he] never received it. And I could not send him that fax from my house. I told him that one was sent and there was an existing extension of my leave.

Q. But he didn't have it in his possession at that time?

A. He didn't have it and said he never received it and based on that fact that he expected me to return to work regardless of the fact that I was telling him that I was unfit because of the complications I was having in my pregnancy. And he said that if he doesn't receive the fax by five p.m. he doesn't care and he expected me to report to work that night. Mr. Slater, who was the union delegate at that time, went to Marshall and told him that he should make special accommodations for me based on the fact that I was pregnant and had complications. And he informed Barry Slater that unless he saw the fax it wasn't relevant to him that I was telling him that I was not medically fit to work, that he expected me to return to work that night, whether or not I was sick, whether or not I was in preterm labor, whether or not I was not feeling well, as long as he did not receive the fax.

Q. Because he did not have that doctor's note from you?

A. Yes, and for some reason I don't know why it was not transmitted to his office, but he said he didn't have it. I then had to physically go to the doctor's office and try to facilitate that. I felt that he should have made accommodations for me based on the fact that I was pregnant even though there was some technical

difficulties. I also feel that in continually allowing me to be scheduled [with] Dr. Niec – all be it the fact that I had continuously requested not to be scheduled. I think that it was contributing to discrimination based on my pregnancy because it again created a hostile work environment for me, which I told them that it affected my health –

Pl. Depo. at 179-182. Viewing the record in the light most favorable to the plaintiff, and assuming that the she did fax a doctor's note regarding her pregnancy, Dr. Marshall, who himself was black, had a legitimate nondiscriminatory reason for not excusing her absence: he never got the fax.

## III. Law

### A. Summary Judgment

Summary judgment is granted if the information before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is evidence enough to preserve a genuine issue as to any material fact, the court should "review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). On a motion for summary judgment, the court may disregard unsupported assertions of either party and review the record independently. *See, e.g., Palmieri v. Lynch*, 392 F.3d 73, 83 (2d Cir. 2004) (finding that plaintiff "introduced no evidence in opposing summary judgment to rebut the record evidence."). "The

27

non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 574 (2d Cir. 2005) (internal citations omitted).

> In discrimination cases, the inquiry into whether the plaintiff's sex (or race, etc.) caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a "sparing" use of the summary judgment device because of juries' special advantages over judges in this area. Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor. Moreover, factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (internal quotation omitted).

B. Statutes of Limitations

    1. Title VII Claims

Pursuant to section 2000e-5(e) of title 42 of the United States Code, "[a]n aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 219 (2d Cir. 2004). "When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." *Id.* at 220.

    a. Discrete discriminatory acts

Section 2000e-5(e)(1) precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period, irrespective of whether other acts of discrimination occurred within the statutory time period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see also Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004).

> Thus, the mere fact that an employee was dismissed within the
> statutory period cannot be used to "pull in [a] time-barred
> discriminatory act," for "continuity of employment, without more,
> is insufficient to prolong the life of a cause of action for
> employment discrimination."

*Id.* at 220 (citing *Morgan*, 536 U.S. at 112-13).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. Such acts are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. "The law is clear that termination and promotion claims may not be based on discrete acts falling outside the limitations period." *Petrosino*, 385 F.3d at 220.

b. Continuing Violation

Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would have been untimely standing alone. *See, e.g., Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993). The policy complained of need not be formal where "there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a

29

policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 362

(2d Cir. 2001).

"Hostile environment claims are different in kind from discrete acts" because "[s]uch

claims are based on the cumulative effect of individual acts." *National R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 115 (2002).

> The timely filing provision only requires that a Title VII plaintiff
> file a charge within a certain number of days after the unlawful
> practice happened. It does not matter, for purposes of the statute,
> that some of the acts of the hostile environment fall outside the
> statutory time period. Provided that an act contributing to the
> claim occurs within the filing period, the entire period of the
> hostile environment may be considered by the court for the
> purposes of determining liability.

*Id.*; *see also Petrosino*, 385 F.3d at 220 ("[I]n the case of a hostile work environment claim, the

statute of limitations requires that only one . . . act demonstrating the challenged work

environment occur within 300 days of filing; once that is shown, a court and jury may consider

'the entire time period of the hostile environment' in determining liability.") (citing *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

For a claim alleging a discriminatory policy or practice to be timely, therefore, two factors

are required. First, at least one act must fall within the time period, and second, that act must be

part of the unlawful employment practice. *See, e.g., Patterson v. County of Oneida*, 375 F.3d

206, 220 (2d Cir. 2004) (rejecting plaintiff's hostile work environment claim as untimely because

although the plaintiff's termination had occurred within the time period, the plaintiff had

"proffered no evidence to show that the termination, even if discriminatory, was in furtherance of

the alleged practice of racial harassment."); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570-71 &

n.6 (2d Cir. 2000) (finding sufficient evidence to support the plaintiff's claim of a hostile work environment but emphasizing that the plaintiff's termination – which the court found to be non-discriminatory – did not constitute support for the claim.).

### 2. Section 1981 Claims

Congress enacted a catchall four-year statute of limitations for suits arising under federal statutes enacted after December 1, 1990. *See* 28 U.S.C. § 1658. Claims under section 1981 "are subject to the 4-year statute of limitations if they arose under an Act of Congress enacted after that date." *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372 (2004).

As here, the plaintiffs in *Jones* claimed that they were subject to discrimination, wrongful termination and a hostile work environment under section 1981. The Court held that the action arose under portions of section 1981 that were added in 1991 so that the catchall four-year statute of limitations applied. *See id.* at 374.

### 3. State and Municipal Claims

The statute of limitations for claims under state and city anti-discrimination laws is three years. *See Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 239 (1983) ("[T]he institution of civil actions to recover damages for unlawful discriminatory practices . . . is governed by the three-year period of limitations . . . .").

### 4. Defamation Claims

The statute of limitations under state law for defamation claims is one year. N.Y. C.P.L.R. § 215(3).

### 5. Breach of Fiduciary Confidentiality Claim

A patient's claim against a medical professional for breach of the fiduciary duty of

confidentiality as a result of the unauthorized disclosure of the patient's medical records is subject to the three-year statute of limitations for negligence. *See, e.g., Tighe v. Ginsberg*, 146 A.D.2d 268, 269, 540 N.Y.S.2d 99 (4th Dep't 1989).

C. Merits

    1. Title VII Claims

        a. Disparate Treatment

Title VII protects individuals from discriminatory employment practices because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1)-(2). "*[I]ndividuals* are not subject to liability under Title VII." *Patterson*, 375 F.3d at 221 (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)) (emphasis added).

Suits under Title VII fall into two basic categories: "single issue motivation cases" and "dual issue motivation cases." *Bickerstaff v. Vassar College*, 196 F.3d 435, 445 (2d Cir. 1999). Single issue motivation cases involve solely the question of whether an impermissible reason motivated the adverse action, while dual issue motivation cases involve "both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason . . . ." *Id.* (quoting *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)).

The nature of the case determines the framework under which the Title VII claims are evaluated. If the plaintiff asserts that her case is one of single issue motivation, then her claim is subject to the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973), which initially imposes a *de minimus* burden of proof on the plaintiff. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) ("While the *prima facie* showing required of a plaintiff in an employment discrimination lawsuit is a very modest one, [defendant's] undisputed evidence of plaintiff's substandard job performance, confirmed by plaintiff's own admissions, preclude[s] his carrying even so minimal a burden.").

According to the *McDonnell Douglas* framework employed in single issue motivation cases, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *See McLee*, 109 F.3d at 134; *see also Townsend v. Nassau County Med. Ctr.*, 558 F.2d 117, 121 (2d Cir. 1977) (reversing district court judgment in favor of black female blood bank technician who was disqualified from continuing former position by new requirement of college degree, where district court had found that college degree requirement had disparate impact on blacks, concluding on appeal that there could be no inference of racial discrimination in plaintiff's case, because "the newly promulgated requirements, neutral on their face, were applied to each employee at the blood bank in a uniform and racially neutral manner.").

A plaintiff will only be considered to have been subjected to an adverse employment action if she endures a "materially adverse change" in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). For the actions complained of to be materially adverse, a change in working conditions must be "more disruptive

33

than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation omitted). A "material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity." *Parrish v. Sollecito*, 258 F. Supp. 2d 264, 269 (S.D.N.Y. 2003) (internal quotations omitted). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Sank v. City Univ. of New York*, 219 F. Supp. 2d 497, 503 (S.D.N.Y. 2002) (internal quotation omitted).

Scheduling inconveniences, disciplinary notices, threats of disciplinary action and excessive scrutiny generally do not constitute adverse employment actions as a matter of law. *See, e.g., Bennet v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (holding that reprimands and threats of disciplinary action did not constitute adverse employment actions).

Once a plaintiff establishes a *prima facie* case of unlawful discrimination, the burden shifts to the defendant to supply a legitimate nondiscriminatory reason for the adverse decision or action. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). The burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted). If the defendant meets its burden of production, the *McDonnell Douglas* framework disappears and the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.* at 143 (citation omitted).

If the plaintiff claims that the case involves dual issue motivation, then the burden-shifting framework outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), is used to evaluate her claim. In the latter framework, the plaintiff may establish a violation if she is able to

34

prove by a preponderance of evidence that a protected characteristic played a motivating factor, though "[d]irect evidence of discrimination is not required . . . ." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-102 (2003). If plaintiff is able to meet her burden, the defendant must prove that it would have taken the same actions in the absence of an impermissible motive. *See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997).

"In the instant matter, while [plaintiff] principally treats this as a single issue motivation case pursuant to *McDonnell Douglas* . . . she does make passing argument for dual issue motivation treatment under *Price Waterhouse* . . . ." *Bickerstaff*, 196 F.3d at 446. Viewing the claim in the light most favorable to the plaintiff, the lower *de minimus* burden illuminates the evidence.

### b. Retaliation

The *McDonnell Douglas* burden-shifting framework applies to claims of retaliation. *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 443 (2d Cir. 1999). According to Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

> In the context of a motion for summary judgment, the plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.

*Richardson*, 180 F.3d at 443. To establish a *prima facie* case of retaliation, the plaintiff must show: "(1) participation in a protected activity that is known to the defendant, (2) an adverse employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision." *Id.*

### c. Hostile Work Environment

In order for a plaintiff to show that he or she was subject to a hostile work environment in violation of Title VII, plaintiff must show:

> (1) that the workplace was permeated with discriminatory
> intimidation that was sufficiently severe or pervasive to alter the
> conditions of [his or] her work environment, and (2) that a specific
> basis exists for imputing the conduct that created the hostile
> environment to the employer.

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation omitted). "Generally, the same standards apply to both race-based and sex-based hostile environment claims." *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 436 n.2 (2d Cir. 1999).

> The first element of a hostile environment claim has both
> an objective and subjective component: "the misconduct must be
> severe or pervasive enough to create an objectively hostile or
> abusive work environment, and the victim must also subjectively
> perceive that environment to be abusive."

*Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

In assessing the atmosphere of the workplace, the court must look at the circumstances in their entirety. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993). Relevant factors may

include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," but "no single factor is required." *Id.* at 23. "Isolated incidents of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores*, 202 F.3d 560, 570 (2d Cir. 2000).

> In order to meet [her] burden [of proving a hostile environment claim], the plaintiff must show more than a few isolated incidents of racial enmity; there must be a steady barrage of opprobrious racial comments; evidence solely of sporadic racial slurs does not suffice.

*Williams v. County of Westchester*, 171 F.3d 98, 100-101 (2d Cir. 1999) (internal quotations omitted). The plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. *See, e.g., Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *Cruz*, 202 F.3d at 571 (concluding that plaintiff had adduced evidence that she and others were subjected to "blatant racial epithets on a regular if not constant basis" and that from this evidence "a jury reasonably might conclude that [the] working environment . . . was hostile to [plaintiff] on the basis of her race.").

A plaintiff must show that he or she was targeted for abusive treatment because of a protected status. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (emphasizing that Title VII prohibits only workplace harassment involving statutorily proscribed forms of discrimination); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile work environment or through such concrete deprivations as being fired or being denied a promotion, is actionable

under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

Favorable or equitable treatment of a protected group as a whole does not preclude a Title VII claim by a member of that group. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Under Title VII, a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."). Nevertheless, "in the absence of evidence suggesting that a plaintiff's [race] was relevant, the fact that both [white] and [non-white] employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their [race]." *Brown*, 257 F.3d at 254.

2. Section 1981 Claims

> Most of the core substantive standards that apply to claims
> of discriminatory conduct in violation of Title VII are
> also applicable to claims of discrimination in employment in violation
> of § 1981 . . . .

*Patterson*, 375 F.3d at 225. The significant differences, for purposes of the instant litigation, are as follows: (1) While Title VII claims are not cognizable against individuals, individuals may be held liable under section 1981 for certain types of discriminatory acts, including those giving rise to a hostile work environment; and (2) Although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, a plaintiff pursuing a claimed violation of section 1981 must show that the discrimination was intentional. *Id.* at 226.

### 3. State and Municipal Claims

"The procedure for demonstrating . . . race discrimination under the state and city antidiscrimination laws follows the familiar *McDonnell Douglas* order of proof for claims brought under Title VII of the Civil Rights Act of 1964 . . . ." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). *See also Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) (state law); *Landwehr v. Grey Advertising, Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995) (city law).

First, plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Norville*, 196 F.3d at 95. Once the plaintiff has established the *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer meets its burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination.

### 4. Defamation Claim

> Defamation is defined as a false statement that exposes a person to public contempt, ridicule, aversion or disgrace. A party alleging defamation must allege that the statement is false. In addition, where the party is a public figure, that party must allege that the statement was made with "actual malice," defined as either knowledge of the falsehood or recklessness as to the falsehood. Where the party alleging defamation is not a public figure, a showing of common-law malice, or ill will, is necessary. Even though a statement is defamatory, a qualified privilege exists where the communication is made to persons who have some common interest in the subject matter.

*Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 171 (N.Y. 2002).

"Under New York law, the plaintiff must establish four elements in order to prevail on a

defamation claim: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3)

published to a third party by the defendant; and (4) resulting in injury to the plaintiff." *Kforce,*

*Inc. v. Alden Personnel, Inc.*, 288 F. Supp. 2d 513, 516 (S.D.N.Y. 2003); 2 Committee on Pattern

Jury Instructions, *New York Pattern Jury Instructions - Civil*, PJI 3:23 (2005) (hereinafter "New

York Pattern Jury Instructions") ("To recover damages for slander, plaintiff has the burden of

proving three elements. . . . First, plaintiff must prove that the statement was defamatory,

meaning that the statement had a tendency to expose the plaintiff to public hatred, contempt,

ridicule or disgrace.  Second, plaintiff must prove that the statement referred to the plaintiff,

meaning that the statement would reasonably be understood to be about the plaintiff.  Third,

plaintiff must prove that defendant published or broadcast the statement, meaning that *the*

*defendant* communicated the statement to someone other than the plaintiff.") (emphasis added).

"A statement that is merely unpleasant, offensive or embarrassing, or that hurts the plaintiff's

feelings, is not necessarily defamatory."  New York Pattern Jury Instructions, PJI 3:23.

> The gravaman of an action alleging defamation is an injury
> to reputation.  The New York Court of Appeals has defined a
> defamatory statement as one that exposes an individual "to public
> hatred, shame, obloquy, contumely, odium, contempt, ridicule,
> aversion, ostracism, degradation, or disgrace, or . . . induce[s] an
> evil opinion of one in the minds of right-thinking persons, and . . .
> deprives one of . . . confidence and friendly intercourse in society."

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citation omitted).

"Communications between a 'plaintiff's former employer ... [and] the plaintiff's

prospective employer cannot support a cause of action to recover damages for defamation'

because New York recognizes a 'qualified privilege' with respect to communications between

former and prospective employers 'as to the character of a former employee ... even though such information may prove ultimately to be inaccurate.'" *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP*, No. 03-CV-0039, 2003 WL 22937683, at *9 (E.D.N.Y. Dec. 2, 2003) (citations omitted); *Serratore v. American Port Servs.*, 293 A.D.2d 464, 465-66, 739 N.Y.S.2d 452 (2d Dep't 2002) ("[A] qualified privilege exists for the purpose of permitting a prior employer to give a prospective employer honest information as to the character of a former employee even though such information may prove ultimately to be inaccurate.") (internal quotation omitted).

A qualified privilege "can only be overcome by a showing that the defamatory remarks 'were made with actual malice.'" *Cellamare*, 2003 WL 22937683, at *9. To show actual malice under the common law, a plaintiff must prove spite, ill will, or "such culpable recklessness or gross negligence as constitutes a wanton disregard of the rights of others." *Konowitz v. Archway School, Inc.*, 65 A.D.2d 752, 753, 409 N.Y.S.2d 757 (2d Dep't 1978). The Supreme Court has established an "actual malice" standard consistent with First Amendment principles: "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). In New York, "the constitutional as well as the common-law standard will suffice to defeat a conditional privilege." *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992).

5. *Patterson v. City of Oneida*

The facts of the instant case bear some resemblance to those in the decision by the United States Court of Appeals for the Second Circuit in *Patterson v. City of Oneida*, 375 F.3d 206 (2d Cir. 2004). In *Patterson*, a terminated employee appealed a district court's grant of summary judgment which ruled that: (1) plaintiff's Title VII claims were time-barred; and (2) plaintiff

failed to proffer evidence sufficient to permit an inference that he had been subjected to discrimination on the basis of his race. On appeal, plaintiff contended that none of his claims were time-barred and that he proffered sufficient evidence to show that there were genuine issues of fact to be tried as to whether he was subjected to a hostile work environment and was fired because of his race, and whether there existed a department custom, policy, or practice of racial discrimination. The Court of Appeals ultimately affirmed the judgment except to the extent that it dismissed hostile work environment claims against two individual defendants who, according to plaintiff, assaulted him by beating him and spraying his eyes with mace while yelling racially offensive comments. On appeal, defendants had taken the position that "the macing incident was mere horseplay and that the challenged conduct was not sufficiently severe to create a hostile work environment . . . ." *Id.* at 231.

For purposes of the law applicable to the instant action, *Patterson* perhaps most importantly stands for the following:

> Affidavits submitted in support of or in opposition to [a] summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The . . . requirement that affidavits be made on personal knowledge is not satisfied by assertions made "on information and belief." However, a verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied upon to oppose summary judgment. Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial. *Nor is a genuine issue created merely by the presentation of assertions that are conclusory.*

375 F.3d at 219 (emphasis added). In *Patterson* the Court of Appeals for the Second Circuit reiterated Rule 56(e)'s provision that "[w]hen a motion for summary judgment is made and supported . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial." *Id.* (emphasis in original).

6. Breach of Fiduciary Confidentiality Claim

New York provides statutory protection for patient privacy. As a leading New York case describes the state policy:

> More than 150 years ago, New York codified the preexisting common-law privilege for doctor patient communications in order to nurture a relationship of trust in health care settings. CPLR 4504 codifies this duty to maintain the confidentiality of patient treatment records. [A] Public Heath Law article 44 medical corporation, is bound by disclosure strictures which govern a physician patient relationship. Moreover, the Legislature has also recognized the legal duty of health maintenance organizations to preserve patient confidentiality by enacting Public Health Law § 4410 (2), which prohibits the disclosure of any information acquired in the course of rendering professional services. The Legislature has further seen fit to extend privileged communication protection to other health and mental health professionals . . . .
> . . . .
> [T]he duty not to disclose confidential personal information springs from the implied covenant of trust and confidence that is inherent in the physician patient relationship, the breach of which is actionable as a tort.

*Doe v. Community Health Plan – Kaiser Corp.*, 268 A.D.2d 183, 186-87, 709 N.Y.S.2d 215 (3d Dep't 2000).

The Department of Health investigated plaintiff's claim of breach of confidentiality: "The investigation did not find any evidence to substantiate your allegation that the nurse practitioner violated Patient Confidentiality." Oct. 9, 2003 D.O.H. Ltr.

## IV. Application of Law to Facts

A. Statutes of Limitations

    1. Title VII Claims

Plaintiff filed her EEOC charge on September 8, 2003. Under the 300-day basic rule of section 2000e-5 of title 42 of the United States Code, claims based on acts alleged to have occurred before November 11, 2002 are time-barred. Plaintiff was suspended in April of 2002 and July of 2002. Her Title VII claims relating to those suspensions are untimely. All scheduling claims arising before November 11, 2002 are also untimely.

*Assuming arguendo* that plaintiff had proffered evidence sufficient to set forth a hostile environment claim, at least one discriminatory act in support of the claim would need to be timely. The only acts alleged to have occurred after November 11, 2002 are plaintiff's claims that on February 21, 2003, Dr. Niec made a comment about her weight, that on February 25, 2004, Dr. Niec allegedly made a racial comment, and that on December 15, 2002, she was assigned to a swing shift. Each of these acts is a discrete act and none will serve as evidence of a discriminatory policy or practice satisfying Title VII's "continuing violation" exception.

    2. Section 1981 Claims

Claims brought under section 1981 of title 42 of the United States Code need not be asserted within the 300-day period applicable to Title VII claims, because of the applicable four-year statute of limitations. The events plaintiff complains of began in May of 2000 and continued through March of 2004, when Ms. Lind resigned. Her complaint was filed on June 16, 2004. Her section 1981 claims, concerning events that occurred after June 16, 2000, are not time-barred.

### 3. State and Municipal Claims

The June 16, 2004 filing date of plaintiff's verified complaint renders plaintiff's state or city claims premised upon acts which occurred prior to June 16, 2001 untimely under New York Executive Law and the New York City Administrative Code's three-year statutes of limitations.

### 4. Defamation Claims

The statute of limitations for defamation claims is one year. Any defamatory act which occurred before June 16, 2003 is time-barred. Plaintiff alleges that defendants defamed her in November of 2002. That claim is untimely. Plaintiff nevertheless claims the following:

> Plaintiff testified that after her child's birth she held a christening which some Department staff attended. The date of the child's christening apparently coincided with the issuance of the DOH determination in October 2003, almost one year after the first publication in November 2002. Plaintiff testified that, almost immediately, the child's father was contacted again and warned that the child was not his. The constant communications apparently led the father to swab the child to obtain enough sample tissue for DNA testing. Considering the fact that Plaintiff's original complaint was filed on June 16, 2004, the events of October 2003 clearly are within the one-year statute of limitations.

Pl. Opp. Summ. Judg. at 16. The allegations of defamation within the statute of limitations are speculative, conclusory, and fatally imprecise. The prior claims are time-barred.

### 5. Breach of Fiduciary Confidentiality Claim

Plaintiff's original complaint was filed on June 16, 2004. The statute of limitations for a breach of fiduciary confidentiality claim is three years. Her breach of patient confidentiality claim stems from her hospitalization on November 23, 2002. It is timely.

## B. Merits

### 1. Discrimination Claims

45

Before reaching the substance of plaintiff's Title VII claims, it is important to note that "individuals are not subject to liability under Title VII." *Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (citation omitted). All Title VII claims against individual defendants are accordingly dismissed on the merits.

The standards for discrimination claims under Title VII, section 1981, and New York State and City law are similar enough for purposes of the instant case. The evidentiary record precludes plaintiff from establishing any of these claims because plaintiff: (1) remains employed; (2) suffered no material adverse change in any of the terms of her employment; and (3) proffered no evidence, beyond speculation and conjecture, that she was treated differently than any similarly situated white P.A.

### a. Disparate Treatment

For plaintiff's disparate treatment claims to survive summary judgment, she must establish a *prima facie* case, *i.e.*, that she suffered a qualifying adverse employment action giving rise to an inference of discrimination. If defendants can present a legitimate nondiscriminatory reason for the disparity, as they have done in the instant case, plaintiff then bears the burden of establishing that the stated reason is simply a pretext for discrimination.

Plaintiff's claims of disparate treatment can be considered in two general categories: (1) administrative complaints regarding scheduling and assignments; and (2) complaints regarding her suspensions. Dismissal of both categories of complaints is appropriate. First, given the particulars of her case, her scheduling and assignment allegations, even if accepted, do not rise to the level of material adverse actions. Second, plaintiff's suspension complaints cannot succeed where the evidentiary record establishes beyond question that there were legitimate,

nondiscriminatory bases for disciplining plaintiff.

### (i) Scheduling and Assignment

As discussed above, a plaintiff will only be considered to have been subjected to an adverse employment action if she has endured a materially adverse change. Plaintiff has failed to demonstrate that she suffered a materially adverse change. At best, she has pled that she did not always get the shifts that she wanted, though she almost always got the shifts that she wanted. She is "still working," "still working nights," "[o]n a three-day schedule," and getting "vacation" and "overtime" as she desires. Pl. Depo. at 295-96.

She has failed to point to any proof that non-black or non-West Indian P.A.'s were given preference in scheduling. To the contrary, in her deposition, plaintiff acknowledged that black West Indian P.A.'s often supervised the self-scheduling system implemented by Ms. Lind. *See* Pl. Depo at 51-53.

Plaintiff's scheduling and assignment complaints are meritless. Those brought pursuant to Title VII are, in addition, time-barred.

### (ii) Suspension

Plaintiff's two suspensions in July and December 2002 cannot support a disparate treatment claim because the Hospital proffered a nondiscriminatory reason for the suspensions and plaintiff has not demonstrated that it was pretextual. The record establishes that five physicians formally complained about plaintiff's performance. Unsatisfactory job performance is a legitimate nondiscriminatory ground for discipline. Plaintiff, rather than imputing discriminatory pretext, testified that two of the doctors who complained about her were good doctors with whom she had a positive experience, excepting of course for their complaints. She

47

has established no motive for those doctors to write letters indicating that she disappeared on shifts, slept on the job, and behaved unprofessionally. The union's decision not to arbitrate one of the suspensions and plaintiff's failure to seek to arbitrate the other support the finding of good faith by defendants.

### b. Retaliation

Plaintiff's retaliation claim lacks merit because she was not subjected to a material adverse employment action on anything other than legitimate, nondiscriminatory grounds. Plaintiff, moreover, is still in the same position, her salary has steadily increased, and she is working the shifts she wishes to work:

> Q. I believe you testified that you made a complaint about [an] allegedly racial comment?
> A. Yes.
> Q. Were you suspended after making that comment?
> A. No.
> Q. Were you disciplined in any way?
> A. No.
> Q. Are you still working?
> A. Can you just repeat the last question. I don't understand the last question.
> Q. I asked if you were disciplined as a result of making that complaint?
> A. The answer is no.
> Q. Are you still working?
> A. Yes, I am.
> Q. Did your shift change in any way after making that complaint?
> A. No.
> Q. Are you still working nights?
> A. Yes.
> Q. On a three-day schedule?
> A. Yes.

Pl. Depo. at 295-96.

### c. Hostile Work Environment

48

Plaintiff's hostile work environment claims are premised upon two alleged isolated remarks by Dr. Niec. Dr. Niec's comments, assumed true only for purposes of summary judgment, are insufficient to give rise to a hostile environment claim. The "blimp" remark, assumed for purposes of summary judgment to be in reference to plaintiff's pregnancy, combined with the "black bitch" comment, are not sufficiently frequent and pervasive to support an actionable hostile environment claim. The court agrees with the Department of Health's February 21, 2003 finding in regard to plaintiff's complaint against Dr. Daniela Niec: "Based on the information provided, the situation described appears to be related to personality conflicts among individuals in a work environment." Pl. Depo. at 274.

2. Defamation Claims

Plaintiff's defamation claims, in addition to being time-barred, are insufficient as a matter of law and precluded by defendants' qualified privilege. On the merits plaintiff's claims of defamation are less than *de minimus*. Their alleged basis – that a family friend named Mimi (whose last name plaintiff cannot recall and who has since left the country never to be located) told Coco or Jacintha (again without last names or any reasonable mode of access) who told plaintiff what a third party said – amounts to a level of hearsay that flouts the requirement of Rule 56(e) that, "[w]hen a motion for summary judgment is made and supported . . . the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."

Plaintiff's defamation claim, like her hostile environment claim, seeks to convert personality conflicts – this time in the way of workplace gossip – into federal litigation.

3. Breach of Fiduciary Confidentiality Claim

49

Plaintiff's breach of fiduciary confidentiality claim is based on the same Mimi-Coco-Jacintha hearsay as the defamation claim and is meritless. The court independently concurs with the Department of Health's conclusion that the nurse practitioner did not violate plaintiff's confidentiality. *See* Oct. 9, 2003 D.O.H. Ltr.

## V. Conclusion

The record, including pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, shows that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. The defendants' motion for summary judgment is granted. Plaintiff's motions for spoliation, to consolidate the case with *Nicholls v. Brookdale*, 03-CV-6233, for trial, and to strike defendants' Rule 56.1 Statement are denied. Plaintiff's cross-motion for summary judgment is denied. All of plaintiff's claims against the defendants are dismissed with prejudice.

No costs or disbursements.

SO ORDERED.

_____
Jack B. Weinstein

Dated: June 22, 2005
      Brooklyn, New York